Filed 10/31/24  P. v. Loaiza CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B332751 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA073083) |
| v. | |
| RONALD ANTHONY LOAIZA, | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Los Angeles County, Jaqueline H. Lewis, Judge.  Affirmed.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan M. Krauss and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2006, a jury convicted Ronald Loaiza of first degree murder for his role in aiding and abetting codefendant Hercules Reyes in the murder of Robert Castro. The trial court sentenced Loaiza to 100 years to life in prison.

Loaiza now asks us to reverse the court's order denying his petition for resentencing filed pursuant to Penal Code[1] section 1172.6 (formerly § 1170.95). As relevant here, that section permits a defendant "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to challenge the conviction and seek resentencing on any remaining counts. (§ 1172.6, subd. (a).)

Loaiza concedes the prosecution presented only a theory of direct aiding and abetting in arguing the jury should convict him of Castro's murder. And he concedes the trial court provided no instructions concerning the felony murder rule, the natural and probable consequences doctrine, or any other theory of imputed malice with respect to Castro's killing. But Loaiza urges the jury nonetheless might have applied the natural and probable consequences doctrine in convicting him of Castro's murder because the court provided an instruction on that doctrine in connection with two other counts charged against codefendant Reyes.

We conclude, however, that the record conclusively forecloses this possibility, and that Loaiza therefore is ineligible for section 1172.6 relief. Accordingly, we affirm.

---

[1] All subsequent statutory references are to the Penal Code.

## FACTUAL SUMMARY AND PROCEDURAL HISTORY[2]

"Early in the evening of November 1, 2005, Reyes fatally shot . . . Castro, and Loaiza shot . . . Salas, who survived his wound. The shootings occurred in front of Salas'[s] house in La Puente.

"Salas had lived in the house for about three years as of November 1. Salas'[s] cousins Christina and Gilbert Gonzalez had lived in the same house for at least three months before November 1. Castro, who was Christina's boyfriend and Salas'[s] friend, was released from prison on November 1. Castro had only been at the house for about [10] minutes when the shooting occurred.

"Salas, Castro, Reyes, and Loaiza all knew one another and appeared to be friends. They all belonged to the Puente gang, albeit to different cliques. On November 1, their cliques got along with one another. . . .

"[¶] . . .[¶]

"Salas testified he and Castro were outside the house, behind the garage, when Reyes and Loaiza arrived on November 1. Everyone shook hands, and Reyes hugged Castro. Reyes asked Castro how he had been, then everyone sat quietly. Reyes hugged Castro again. Salas asked Reyes how he had fit an inflatable 'bounce house' into his trunk for a birthday party a few days earlier. Reyes complained that it broke his trunk and said, 'Come on, check

---

[2] We summarize here only the facts and procedural history relevant to our resolution of this appeal. Although we set forth a brief account of the circumstances of the offense taken from our opinion in Loaiza's direct appeal (see *People v. Loaiza et al.* (Jan. 9, 2009, B198074) [nonpub. opn.] (*Loaiza I*)), we do so only to provide context for our present opinion. Our resolution of Loaiza's appeal does not rely on this factual account.

it out.'  All four men went out to the street, where Reyes opened his car trunk to show them it would not stay open.

"Reyes then said to Castro, 'Check out my car.'  Reyes got into the driver's seat and Castro got into the front passenger seat.  Someone turned up the volume on the radio, then Salas heard a gunshot inside the car.  He looked through the car window and saw Reyes holding the grip of a handgun and Castro holding its barrel, struggling with Reyes.  Salas heard Castro say, 'What the fuck?'  Salas immediately looked at Loaiza, who was about 18 feet away from him.  Loaiza lifted his sweater, pulled out a revolver, and pointed it at Salas'[s] head.  Salas stood still, put his hands in the air, and said, 'No.'  Loaiza aimed a little lower and pulled the trigger.  The shot struck Salas a little below his stomach and passed through his body.  Salas ran to the back of the house.  As he ran, he heard about four more shots from the vicinity of Reyes'[s] car."  (*Loaiza I*, *supra*, B198074, fns. omitted.)

The district attorney filed an information charging both Reyes and Loaiza with the murder of Castro (§ 187, subd. (a)) (count 1), the willful, deliberate, premeditated attempted murder of Salas (§§ 187, subd. (a), 664) (count 2), possession of a firearm by a felon (§ 12021, subd. (a)(1)) (counts 3 and 4), and assaulting Salas with a firearm (§ 245, subd. (a)(2)) (count 5).  The information also alleged firearm use enhancements (§ 12022.53, subds. (d) & (e)(1)) and gang enhancements (§ 186.22, subd. (b)(1)(C)) against each defendant.

At the defendants' joint trial, the prosecution theorized that Reyes and Loaiza killed Castro because they believed he was involved in the 2004 murder of their cousin, Gabriela Santini.  The prosecution argued that Reyes personally killed Castro by shooting him, while Loaiza directly aided and abetted Castro's

4

killing by preventing witnesses—including Salas—from thwarting the planned murder:

"[Prosecutor]: . . . [F]rom the evidence, you see that we're saying that Mr. Reyes shot and killed Mr. Castro, and that Mr. Loaiza shot Mr. Salas . . . .

" . . . [A]s to Mr. Loaiza, how is he held responsible under the law for the murder of Mr. Castro? Under the law of aiding and abetting, if someone goes with the knowledge of the unlawful purpose of the perpetrator—meaning if Mr. Loaiza knew what Mr. Reyes was planning to do—they were in on it together. They went over there for that purpose, to kill Mr. Castro. . . .

"And what did [Loaiza] do to help and promote [Reyes]? Keeping witnesses at bay. Keeping them away so that they can't interrupt. . . .

"[¶] . . . [¶]

" . . . The murder of Mr. Castro was not something that just Mr. Reyes did on the spur of the moment. You can see from Mr. Loaiza's actions . . . that he was very much a part of the plan to go over there and to take care of Mr. Castro."

Neither the prosecutor nor defense counsel made any arguments concerning imputed malice with respect to the murder of Castro. And the trial court did not instruct on the felony murder rule, the natural and probable consequences doctrine, or any other theory of imputed malice with respect to that count. Rather, the trial court instructed on direct aiding and abetting, as well as the elements of first and second degree murder.

The prosecution did rely on the natural and probable consequences doctrine in asking the jury to convict Reyes of the attempted murder of Salas. Nothing in the prosecutor's argument, however, invited the jury to rely on that doctrine to convict Reyes or Loaiza of Castro's murder. To the contrary, the prosecutor's

argument identified the murder of Castro as the prerequisite target offense supporting application of the natural and probable consequences doctrine to convict Reyes of the attempted murder of Salas:

"[Prosecutor]: . . . [I]t's obvious from the evidence that it was Mr. Loaiza that shot Mr. Salas, not Mr. Reyes. But Mr. Reyes is guilty of that attempted murder under what we call the natural and probable consequences [doctrine]. . . .

"In this case, when Mr. Reyes and Mr. Loaiza are going to target Mr. Castro, where did they go? They didn't go to a place where they knew Mr. Castro would be alone. They went to a residence, a place that he was going to be staying with other people, people that have been living at that residence previously. So it's pretty much common sense that you know there are going to be other people there. And if you're willing to do it at that time, at that place, you know that a natural and probable consequence is that one of those other residents, or a neighbor, or friend that's there, is going to get in the way, and you're going to have to deal with that person. . . .

"They were prepared for whatever. They both had guns, not just one person. You can see that they split up who had to do what. So that's how even though it was Mr. Loaiza that shot at Mr. Salas, Mr. Reyes is also guilty of that attempted murder because he went intending to commit a murder of Mr. Castro, knowing that there would be other people around, and it's a natural and probable consequence that he would have to take care of someone else, a witness, someone that may try to prevent what's going on."

Defense counsel likewise addressed the natural and probable consequences doctrine only in connection with the attempted murder charged against Reyes in count 2. Loaiza's counsel did not

6

reference the doctrine at all during argument, while Reyes's counsel argued in closing:

"Count 2 is flipped around because the evidence, if you believe the evidence you heard, says that Mr. Loaiza shot Mr. Salas, but yet the prosecution wants to jump the extra hurdle and say let's hold Mr. Reyes accountable for that because of another theory that we call natural and probable consequence[s]. Did they try to basically include both of the defendants under the umbrella that whatever happened at the [scene of the crime] was a natural and probable consequence of whatever plans they may have had? But I disagree with that."

Consistent with the parties' closing arguments, the jury instruction on the natural and probable consequences doctrine identifies Castro's murder as the prerequisite target offense permitting application of the doctrine, and it invites the jury to consider the doctrine only as to codefendant Reyes and only with respect to the attempted murder of Salas (count 2) and assault with a firearm (count 5) charges:

"One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime or those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.

"In order to find the *defendant Reyes* guilty of *the crimes of attempted murder and [section] 245[, subd.] (a)(2), as charged in counts 2 and 5*, you must be satisfied beyond a reasonable doubt that:

"One, the crime or crimes of attempted murder and [section] 245[, subd.] (a)(2) were committed;

"Two, that the defendant aided and abetted in those crimes;

7

"Three, that a coprincipal in that crime committed the crimes of attempted murder and [section] 245[, subd.] (a)(2) . . . ;

"*Four, the crimes of attempted murder and [section] 245[, subd.] (a)(2) were a natural and probable consequence of the commission of the crimes of murder as charged in count 1.*

"[¶] . . . [¶]

"You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that *the defendant aided and abetted the commission of an identified and defined target crime and the crime of attempted murder as charged in [sections] 667/187, count 2, and [section] 245[, subd.] (a)(2[),] count 5, was a natural and probable consequence of the commission of that target crime.*" (Italics added.)

The jury convicted both defendants on all counts, determined Castro's murder to be of the first degree, and found true the gang enhancement allegations. The jury also found true that "[Reyes] personally and intentionally discharged a firearm, a handgun, which proximately caused death to . . . Castro," and that "[Loaiza] personally and intentionally discharged a firearm, a handgun, which proximately caused great bodily injury to . . . Salas." The trial court sentenced Loaiza to a total of 135 years 4 months to life in prison. We affirmed Loaiza's convictions on appeal, but reversed the true findings on the gang enhancement allegations and ordered certain modifications to his sentence. (*Loaiza I*, *supra*, B198074.) On remand, the trial court sentenced Loaiza to 100 years to life in prison.

Twelve years after Loaiza's conviction, "the Legislature passed Senate Bill [No.] 1437 [(2017–2018 Reg. Sess.) (Senate Bill No. 1437)] 'to amend the felony murder rule and the natural and

8

probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*); accord, *People v. Arellano* (2024) 16 Cal.5th 457, 467–469.)

The bill "substantially modified the law relating to vicarious liability for murder by eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder [citation] and by narrowing the scope of felony murder." (*People v. Lopez* (2022) 78 Cal.App.5th 1, 11.) The bill also added section 1172.6, which provides a procedure whereby "convicted murderers who could not be convicted under the law as amended" may petition to have their conviction vacated and be resentenced on any remaining counts. (*Lewis*, *supra*, 11 Cal.5th at p. 959.) Via Senate Bill No. 775 (2021–2022 Reg. Sess.), the Legislature subsequently expanded the scope of section 1172.6's relief to defendants convicted of murder pursuant to any "other theory under which malice is imputed to a person based solely on that person's participation in a crime," and defendants convicted of "attempted murder under the natural and probable consequences doctrine." (§ 1172.6, subd. (a)(1); *People v. Coley* (2022) 77 Cal.App.5th 539, 548 (*Coley*).)

Defendants who fall within section 1172.6's parameters may seek the relief the statute contemplates by "fil[ing] a resentencing petition . . . alleging they could not currently be convicted of murder because of the changes in the law required by Senate Bill No. 1437." (*People v. Hurtado* (2023) 89 Cal.App.5th 887, 891.) "If [a] petitioner ma[kes] a prima facie showing for relief, the trial

9

court [is] required to issue an order to show cause for an evidentiary hearing." (*Ibid.*, citing § 1172.6, subd. (c).)

In assessing eligibility at the prima facie stage, the court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved." ' " (*Lewis*, *supra*, 11 Cal.5th at p. 971.)  The court may deny the petition at the prima facie stage if the record of conviction "conclusively establishes every element of the offense" under a theory of murder that remains valid following the enactment of Senate Bill No. 1437.  (*People v. Curiel* (2023) 15 Cal.5th 443, 463 (*Curiel*).)  Where a trial court denies a section 1172.6 petition based on the failure to make a prima facie case for relief, our review is de novo.  (See *Coley*, *supra*, 77 Cal.App.5th at p. 545.)

Loaiza filed a pro se petition pursuant to section 1172.6 challenging his convictions for the murder of Castro and the attempted murder of Salas.  After the trial court appointed counsel to represent Loaiza in connection with the petition, he filed a response conceding his ineligibility for relief on his attempted murder conviction, but persisting in his request for an evidentiary hearing concerning his conviction for Castro's murder.

The court denied Loaiza's petition at the prima facie stage, explaining in relevant part:

"Given that the natural and probable consequences jury instruction went to the other defendant[, Reyes,] as to the attempted murder, I do not see that any of those instructions [on imputed malice principles] were given.  I do not see in looking at this—what I'm allowed to look at—I'm not looking at the appellate court decision for anything else—the court does not believe that a prima facie case has been made, and at this time, the . . .

10

[section] 1172.6 [petition] is denied as the court believes [Loaiza] is ineligible as a matter of law."

Loaiza timely appealed.

## DISCUSSION

Loaiza is ineligible for section 1172.6 relief as a matter of law because the record establishes that the jury convicted him of first degree murder as a direct aider and abettor—a theory of murder liability that remains valid post-Senate Bill No. 1437.  (See *Coley*, *supra*, 77 Cal.App.5th at p. 546.)

The prosecution presented only one theory of Castro's murder to the jury:  that Loaiza personally harbored the intent to kill Castro and directly aided and abetted Reyes's willful, deliberate, premeditated killing of Castro by keeping witnesses—including Salas—from interfering in the murder.

Consistent with this theory, the trial court instructed the jury with CALJIC No. 3.01 that, to convict Loaiza as a direct aider and abettor in Castro's murder, it must conclude that Loaiza acted "[w]ith knowledge of the unlawful purpose of the perpetrator" and "[w]ith the intent or purpose of committing or encouraging or facilitating the commission of the crime."  The court instructed further, using CALJIC No. 8.20, that to convict Loaiza of murder in the first degree, it must find that Castro's "killing was preceded and accompanied by a clear, deliberate intent on the part of a defendant to kill."[3]  Together, these instructions permitted the jury to convict Loaiza of first degree murder as a direct aider and abettor in

---

[3] Although the written version of CALJIC No. 8.20 provided to the jury here states that the killing must be accompanied by an intent to kill on the part of "*the* defendant" (italics added), the trial court's oral instructions to the jury referred to an intent to kill on the part of "*a* defendant."  (Italics added.)

11

Castro's killing only if Loaiza knew of Reyes's plan to kill Castro and acted with the intent to facilitate that plan. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30 [court presumes jury followed jury instructions].)

Finally, with respect to Castro's murder, the trial court did not instruct on the felony murder rule, the natural and probable consequences doctrine, or any other theory pursuant to which malice may be imputed to a defendant. The record thus establishes that, in convicting Loaiza of the first degree murder of Castro, the jury found beyond a reasonable doubt that he acted with express malice, along with the other requisite elements of the offense. We therefore conclude Loaiza is categorically ineligible for section 1172.6 relief. (See *Curiel*, *supra*, 15 Cal.5th at p. 462.)

We are not persuaded otherwise by Loaiza's contention that, because the trial court instructed the jury on the natural and probable consequences doctrine with respect to the attempted murder (count 2) and assault with a firearm (count 5) charges against codefendant Reyes, "the jury could reasonably have convicted [Loaiza] of first degree murder . . . under [natural and probable consequences] principles."

Loaiza's argument proceeds as follows: (1) although intended to apply only to the charges in counts 2 and 5 against Reyes, the jury might erroneously have considered the trial court's instruction on the natural and probable consequences doctrine during its deliberations on the first degree murder of Castro charged in count 1, (2) the jury could have concluded that "Reyes intended to confront . . . Castro at gunpoint to determine whether he was responsible for . . . Santini's death, and thereby intended [only] an assault with a firearm, and that . . . Castro's murder was a natural and probable consequence of such a contemplated assault," (3) the jury therefore might have convicted Reyes of Castro's murder

12

without concluding that Reyes harbored the intent to kill, and (4) as a result, the jury could have convicted Loaiza as Reyes's direct aider and abettor in Castro's murder without finding that Loaiza acted with the intent to kill.

Loaiza points to the comment by Reyes's counsel in closing argument concerning the natural and probable consequences doctrine, as well as certain form instructions (CALJIC Nos. 1.00, 1.01, 3.00, 3.01, and 17.31), as increasing the likelihood that the jury impermissibly relied on that doctrine in convicting him of Castro's murder.

Loaiza's arguments, however, hinge entirely on the possibility that the jury convicted Reyes of Castro's murder without finding that Reyes harbored the intent to kill Castro. And the record here forecloses that possibility.

As set forth, *ante,* the prosecution argued at trial that Reyes went to Salas's house for the express purpose of killing Castro, and that Reyes carried out his plan by luring Castro into a vehicle and shooting him. The prosecution offered no alternative theory of Castro's killing. And although presented with the option to convict Reyes of the lesser offense of the second degree murder of Castro, the jury convicted Reyes of first degree murder—meaning, the jurors necessarily concluded that Reyes did not merely intend to confront Castro at gunpoint. Rather, Reyes "weigh[ed] and consider[ed] the question of killing and the reasons for and against such a choice and, having in mind the consequences, . . . decide[d] to and [did] kill" Castro.

Thus, even if the jury erroneously believed it *could* apply the natural and probable consequences doctrine to convict Reyes of Castro's murder, the record conclusively establishes that the jury did not do so. The record instead demonstrates the jury found

13

that Reyes acted with the intent to kill Castro. Loaiza's arguments therefore fail.[4]

Accordingly, we affirm the trial court's order denying Loaiza's section 1172.6 petition at the prima facie stage.

## DISPOSITION

The order denying Loaiza's section 1172.6 petition is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

KLINE, J.*

---

[4] In light of our conclusion, we need not address Loaiza's remaining arguments, including that post-*Curiel*, a court may not deny section 1172.6 relief at the prima facie stage based on a determination that it is not " 'reasonably likely' " the jury interpreted the trial court's instructions in an impermissible manner.

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.